# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5839 | **DATE** | 5/25/2004 |
| **CASE TITLE** | Nese vs. Nordic Construction Services, Inc., et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment is granted. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

date docketed: MAY 26 2004

Mail AO 450 form. ✓

courtroom deputy's initials: MF

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOUIS V. NESE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NORDIC CONSTRUCTION SERVICES, INC. and ) <br> ADMINISTAFF, INC., ) <br> ) <br> Defendants. ) | No. 02 C 5839 <br><br> Judge John W. Darrah |

**DOCKETED**
**MAY 2 6 2004**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Louis V. Nese, filed a suit against Defendants, Nordic Contrsuction Services, Inc. and Administaff, Inc., alleging: (1) that Nordic violated the American with Disabilities Act ("ADA") by reducing Plaintiff's wages and terminating Plaintiff because he had epilepsy and that Administaff assisted, after the fact, in creating a non-discriminatory explanation for Nordic's actions (Count 1); (2) that those actions allegedly taken by the Defendants also violated the Rehabilitation Act (Count II); and (3) that Nordic fraudulently induced Plaintiff into relinquishing his involvement with the Downers Grove Chamber of Commerce and the "Lodge" (Count III). Presently before the Court is Defendants' Motion for Summary Judgment.

### BACKGROUND

Defendant, Julian & Nordic Industries, Inc. ("Nordic"), incorrectly identified as Nordic Construction Services, Inc., is a general contractor in the business of providing commercial and residential general contractor services, as well as fire and water damage restoration services. (Def.'s 56.1(a)(3) Statement ¶1). Administaff Companies II, L.P. ("Administaff") is a professional personnel management services company. (Id., ¶ 2).

Nese is a forty-three-year-old male who began having seizures when he was fifteen years old. (Def.'s 56.1(a)(3) Statement ¶¶ 4, 7). Because of his seizures, Nese has taken prescription medication for approximately twenty-seven years. (Id., ¶ 8). Nese does not experience any side effects from his medications. (Id., ¶ 14). Prior to his work with Nordic, Nese worked as a carpenter for various employers, including Handy Andy and Builders Square. (Id., ¶ 10). Nese did not have any seizures during his employment with Nordic. (Id., ¶ 11).

From approximately 1991 to 1998, Nese was on disability and unable to work in any capacity due to constant seizures relating to his condition of epilepsy. (Plaint.'s 56.1(b)(3) Statement ¶ 2). In approximately 1997, Nese came off of social security disability. Since that time, Nese's seizure disorder has not affected his ability to work or his quality of work. (Def.'s 56.1(a)(3) Statement ¶¶ 12-13).

After coming off of social security disability, Nese worked for his own construction company, L & N Builders ("L & N"). L & N became incorporated in approximately 1998. L & N did remodeling jobs. (Def.'s 56.1(a)(3) Statement ¶ 15). From 1997 until Nese began working for Nordic, Nese did not work for anyone except L & N. (Id., ¶ 16). At times, L & N lost money. (Id., ¶ 17). In the year prior to accepting employment with Nordic, Nese was the only employee of L & N. Nese could not find employees to stay and work for L & N even though he had advertised for employees in newspapers. (Id., ¶ 18). At one point, Nese had to turn away $40,000 in business because he did not have any employees. (Id., ¶ 19). In August 2000, when Nordic offered Nese a job, Nordic had given Nese a number of subcontracting jobs. (Id., ¶ 20). After Nese joined Nordic, he did not intend to keep L & N as a viable corporation. (Id., ¶ 21). Nordic never asked Nese to make certain that L & N was no longer viable. (Id., ¶ 22).

2

Prior to starting employment with Nordic, Nese was a member of the Downers Grove Chamber of Commerce and a member of a business-networking group called the Lodge. Only one construction contractor was allowed to be a member in the Lodge. (Def.'s 56.1(a)(3) Statement ¶ 24). Nese's membership in the Lodge was as the construction contractor. (Plaint.'s 56.1(b)(3) Statement ¶ 5). Prior to August 31, 2000, Tom Julian, Nordic's owner and president, was also a member of the Lodge. At that time, Julian did not participate in the Lodge as a construction contractor. (Def.'s 56.1(a)(3) Statement ¶ 25). Julian was instrumental in Nese's joining the Chamber of Commerce and the Lodge. (Id., ¶ 30). Julian told Nese that he wanted Nese's seat on the Lodge as the construction contractor. Nese told Julian that everyone in the Lodge knew Nese and asked Julian if he could remain in the Lodge and attend the meetings on behalf of Nordic. (Plaint.'s 56.1(a)(3) Statement ¶ 6). Julian's membership in the Lodge was for a cleaning service that Julian owned. (Id., ¶ 7)

The Lodge is a group of 20 to 25 members from different businesses who get together to give each other leads for new business opportunities. The group meets once a week. (Def.'s 56.1(a)(3) Statement ¶ 27). To join the Lodge, the potential new member must get a current member to bring in the new member. It costs $75 per month to be in the Lodge. (Id., ¶ 28). The Lodge only allows one member per business category. Julian was the founder of the Lodge. (Plaint.'s 56.1(b)(3) Statement ¶ 9).

Between 1998 and 2000, Nese and Julian were friends and had a business relationship in which they assisted each other in generating business. (Def.'s 56.1(a)(3) Statement ¶ 29). From the time that Nese joined the Lodge until his termination from Nordic, Nese earned between $8,000 and $12,000 from business generated from activities with the Lodge. This business came from two

3

sources – work completed in Nese's accountant's home and subcontracting work from Julian's fire damage restoration company. (Id., ¶ 31). Prior to Nese's accepting employment with Nordic, Julian told Nese that he would have to relinquish his seat in the Lodge once he accepted employment with Nordic. (Plaint.'s 56.1(b)(3) Statement ¶ 11).

After obtaining employment with Nordic in August 2000, Nese decided not to renew his membership in the Chamber of Commerce. He made this decision because he was working for Nordic and did not want to spend $280 for the membership. (Def.'s 56.1(a)(3) Statement ¶ 33). Nese also decided that he did not need to generate business from the Lodge because he now worked for Nordic. Within a few weeks of starting his employment with Nordic, Nese gave up his membership in the Lodge. (Id., ¶ 34). With Nese's consent, Julian took Nese's place in the Lodge. (Id., ¶ 35).

In 1998 or 1999, Julian first offered Nese a job with Nordic. Nese did not accept the position. (Def.'s 56.1(a)(3) Statement ¶ 36). In August 2000, Julian again wanted to hire Nese for a job with Nordic. At that time, Nese informed Julian that he was unable to drive to work because he did not have a driver's license because he had epilepsy. Nese's inability to drive was a factor in his search for employees for L & N. When Nese told Julian that he had epilepsy, Julian's response indicated that he did not consider such to be a factor in Nese's employment. Subsequently, Julian hired Nese and provided another employee to drive Nese until Nese was able to obtain his driver's license. (Id., ¶ 38). At the time Julian offered Nese a job, Julian told Nese that the offer would allow Nese to work with a team, take pressure off of Nese in terms of finding work, and provide Nese with benefits. (Id., ¶ 39). Because Nese was only doing subcontracting work for Nordic and Nese was

4

having a difficult time finding employees, Nese accepted a position with Nordic. (Id., ¶ 41). Julian also told Nese that Nese would no longer have to worry about having a job. (Plaint.'s 56.1(b)(3) Statement ¶ 17).

Nordic hired Nese as a carpenter on August 31, 2000, at the rate of $22.50 per hour. (Def.'s 56.1(a)(3) Statement ¶ 43). When Nese joined Nordic, Julian informed him that he would have a 90-day trial period to see if Julian wanted to retain him at Nordic. (Id., ¶ 46).

As a carpenter for Nordic, Nese gutted out fire-damaged rooms in homes and remodeled such areas. He performed rough and finish carpentry work, including putting up drywall, replacing windows, putting in trim, and putting in cabinets. (Def.'s 56.1(a)(3) Statement ¶ 48). Nese also did roofing work. (Id., ¶49).

Effective February 28, 2001, Nese's hourly rate was reduced to $18.00 per hour. (Def.'s 56.1(a)(3) Statement ¶ 50). Nese's wage was changed because his work pace was not up to the standards of his peers. (Id., ¶ 51). Nese believes that Julian told him his wage was reduced because other workers were making less than Nese and that it was causing a problem. (Id., ¶ 52). Prior to his reduction in pay, Nese's supervisor, Gary Boerma, never commented to or made complaints to Nese regarding deficiencies in Nese's productivity. (Plaint.'s 56.1(b)(3) Statement ¶ 18). Boerma testified that he did speak to Nese on multiple occasions concerning problems with Nese's work. (Boerma's Dep. pp. 45-46, 54-59). When Nese's hourly rate was decreased to $18.00 per hour, Julian completed an Employee Status Change form, which did not contain any comments relating to the pace of Nese's work. (Plaint.'s 56.1(b)(3) Statement ¶ 46). At some time, the form was amended; and the comment "Work pace is not to standards of peers" was added. Julian is unsure

5

whether he altered the form the year following the March 12, 2001 date that he originally completed and signed the form. (Id., ¶ 48).

Nordic believed that Nese's pace was deficient, and Nordic personnel had numerous concerns and conversations regarding Nese's work pace. (Def.'s 56.1(a)(3) Statement ¶ 54). Nese believed that his work "may not have been exactly" like other workers, but it "was comparable." (Nese Dep. p. 145). During his employment, Nese's supervisor, Gary Boerma, asked Nese, as well as other workers, to pick up his pace. (Def.'s 56.1(a)(3) Statement ¶¶ 56-57). Of three instances in which Boerma asked Nese to pick up his pace, one was a general address to all employees; and two were to Nese personally. (Id., ¶ 59). Nese believed that he was made the scapegoat for cost overruns and the length of time it took to complete projects because everyone around Boerma was either family or had been around for years. (Id., ¶ 64). Nese also believes that Julian asked him twice, following his decrease in pay, whether the medications Nese took affected his ability to perform his job. (Plaint.'s 56.1(b)(3) Statement ¶ 24). Julian denies ever having asked Nese about his medications and his ability to perform his job. (Julian's Dep. pp. 80-81).

On September 27, 2001, a performance evaluation was completed by Boerma. Following the completion of the evaluation, a meeting was held. At the meeting, Nese was shown a copy of the evaluation; at which time, there was no whiteout on page four of the evaluation. (Plaint.'s 56.1(b)(3) Statement ¶ 26). Boerma denies that the whiteout did not exist at the time of the evaluation, and the whiteout was used to change a comment that another Nordic employee did not feel was professional. (Def.'s Resp. to Plaint.'s 56.1(b)(3) Statement ¶ 26). Nese believes that he requested a copy of his performance evaluation and that the request was denied. Nordic denies that Nese requested a copy of the evaluation. (Id., ¶ 28). Nese's performance score for his evaluation

6

was 32 points out of 60, 2 points greater than the minimum score of 30 for "satisfactory." (Plaint.'s 56.1(b)(3) Statement ¶ 36).

On October 10, 2001, shortly after Nese had completed his first year of employment with Nordic, Julian increased Nese's hourly rate of pay from $18.00 per hour to $18.50 per hour. (Plaint.'s 56.1(b)(3) Statement ¶ 40).

On November 5, 2001, Nordic received a letter from a legal advocacy group acting on Nese's behalf wherein the legal advocate accused Nordic of possible discriminatory acts relating to their treatment of Nese. Prior to this letter, Nese's personnel file contained only two references relating to the pace of his work: (1) the March 12, 2001 Employee Status Change form and (2) the September 27, 2001 performance evaluation. (Plaint.'s 56.1(b)(3) Statement ¶ 33).

On January 9, 2002, Nese was transferred to the insurance repair work side of Nordic's business. On that date, Julian signed an Employee Status Change form that documented Nese's transfer. In the remarks section, Julian wrote, "Pace of work is still a problem – smaller jobs will be better suited to gauge pace." At the time Julian completed the form, Julian claims he was unaware that Nese was investigating the possibility of a discrimination suit. (Plaint.'s 56.1(b)(3) Statement ¶ 43). On January 18, 2002, Nese was placed on temporary lay-off due to lack of work. (Def.'s 56.1(a)(3) Statement ¶ 66). On or about October 17, 2002, Nese felt that Julian and Boerma fired him because they did not think that Nese knew what he was doing. (Id., ¶ 68).

Between October 2003 and April or May 2003, Nese worked fixing up a home. (Def.'s 56.1(a)(3) Statement ¶ 69). Since that time, Nese has worked with One Stop Construction. (Id., ¶70). Nese has been able to perform his construction job without asking for an accommodation. (Id., a ¶ 71). Nese is not limited in his ability to work, and he admits that he can work. (Id., ¶ 74).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

### Count 1

Defendant argues that Nese's ADA claim fails because he is not "disabled" as defined by the ADA.

The ADA prohibits employment discrimination against disabled individuals. 42 U.S.C. § 12112(a); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1059 (7th Cir. 2000). Under the ADA, an individual is disabled if he (a) has "a physical or mental impairment that substantially limits one or more . . . major life activities"; (b) has "a record of such an impairment"; or (c) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). If an individual's condition does not rise to the level of a disability, the individual cannot recover under the ADA even if the employer terminated the individual on the account of the account. *See Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir. 1998) (*Skorup*).

8

Nese contends that he is disabled under 42 U.S.C. § 12102(2)(C) because Nordic regarded him as having a disability that substantially limited the major life activity of working.

It is not enough for Nese to show that Nordic was aware of his impairment; instead, Nese must show that Nordic knew of the impairment and believed that he was substantially limited because of it. *See Skorup*, 153 F.3d at 515. Accordingly, Nese must show that Nordic believed he was unable to work a particular class or broad range of jobs. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 955 n. 7 (7th Cir. 2000) (*Moore*); *Skorup*, 153 F.3d at 515.

Nese makes the conclusory statement that there is sufficient evidence from which a reasonable fact-finder could conclude that Nordic believed that Nese's condition would exclude him from a broad range of jobs. However, the only evidence that Nese provides to support his conclusion is that of pretext -- the alleged alteration of two documents to indicate that Nese worked too slowly. However, evidence that Nordic may have been less than forthcoming in identifying the reason for his termination does not establish a disability; instead, it may provide proof of a discriminatory motive once Nese has established that he falls within the ADA's protection. *See Moore*, 221 F.3d at 955 n. 7; *Rakity v. Dillon Co.*, 302 F.3d 1152, 1165 (10th Cir. 2002) (rejecting argument that issue of pretext and the issue of "regarded as" should be treated as one and the same). Nese fails to point to any evidence that Nordic perceived him as impaired in performing a broad range of jobs in various classes. Instead, all of the evidence demonstrates that Nese worked in construction prior to his tenure with Nordic, while at Nordic, and following his termination at Nordic. Furthermore, the only issue Nordic had with Nese's job performance was the pace of his work. Nordic had the same issue with other employees and told other employees to pick up the pace of their work *See Moore*, 221 F.3d at 949, 955 (affirming summary judgment after District Court found, in part, that plaintiff's

9

ability to walk, sit and stand, but at a slower pace, did not render the plaintiff disabled). Therefore, Nese has failed to establish that he is disabled under the ADA; and his ADA claim fails.

## Count II

Nese concedes that his Rehabilitation Act claim fails because he is not a federal employee alleging disability discrimination in federal government or in a program that receives federal financial assistance as required by the Act. *See* 29 U.S.C. §§ 791, 794; *Mays v. Principi*, 301 F.3d 866, 868 (7th Cir. 2002).

## Count III

Lastly, Nordic argues that Nese's fraud claim fails. Nese argues that genuine issues of fact exist as to whether Julian offered Nese a position of employment as part of a scheme to induce Nese to relinquish his seat in the Lodge.

In order to prove fraud under Illinois law, Nese must establish: that (1) the defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce Nese to act; (5) Nese justifiably relied on the statement; and (6) Nese suffered damages from such reliance. *See Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (*Houben*). "Promissory fraud" is a false representation of intent concerning future conduct, *i.e.*, a promise to perform a contract when there is no actual intent to do so. As a general rule, promissory fraud is not actionable unless the promise is part of a "scheme" to defraud. *See Houben*, 231 F.3d at 1074. Furthermore, "'[w]ithout specific, objective manifestations of fraudulent intent, there can be no promissory fraud." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (internal quotations omitted).

10

Here, Nese fails to identify any false statement or representation by Julian. Instead, Nese contends that genuine issues of material fact exist as to whether there was a scheme to have him relinquish his seat on the Lodge. However, Nese knew before accepting employment with Nordic that he would have to give up his seat in the Lodge; and Nese fails to identify any false statement or representation by anyone to induce him to accept employment with Nordic and relinquish his seat in the Lodge. Without any false statement or representation, there cannot be fraud. *See Houben*, 231 F.3d at 1074. Furthermore, Nese has failed to identify any evidence of any "specific, objective manifestations of fraudulent intent." *See Bower*, 978 F.2d at 1012 (plaintiff's fraud claim failed because plaintiff failed to prove that the defendants made a promise never intending to keep it). Accordingly, his fraud claim fails.

For the reasons stated above, Defendants' Motion for Summary Judgment is granted.

Dated: May 25, 2004

JOHN W. DARRAH
United States District Judge

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Nese             **JUDGMENT IN A CIVIL CASE**

v.             Case Number: 02 C 5839

Nordic Construction Services, Inc., et. al.

☐   Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■   Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated in the Court's memorandum opinion and order of 5/25/04, defendants' motion for summary judgment is granted.

Michael W. Dobbins, Clerk of Court

Date: 5/25/2004

Melanie A. Foster, Deputy Clerk

# United States District Court
## Northern District of Illinois
### Eastern Division

Nese

JUDGMENT IN A CIVIL CASE

v.

Case Number: 02 C 5839

Nordic Construction Services, Inc., et. al.

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated in the Court's memorandum opinion and order of 5/25/04, defendants' motion for summary judgment is granted.

Michael W. Dobbins, Clerk of Court

Date: 5/25/2004

MELANIE FOSTER
_____
Melanie A. Foster, Deputy Clerk

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Nese

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 02 C 5839

Nordic Construction Services, Inc., et. al.

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated in the Court's memorandum opinion and order of 5/25/04, defendants' motion for summary judgment is granted.

Michael W. Dobbins, Clerk of Court

**MELANIE FOSTER**

Date: 5/25/2004

Melanie A. Foster, Deputy Clerk

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Nese                                      **JUDGMENT IN A CIVIL CASE**

            v.                              Case Number: 02 C 5839

Nordic Construction Services, Inc., et. al.

☐      Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■      Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated in the Court's memorandum opinion and order of 5/25/04, defendants' motion for summary judgment is granted.

                                               Michael W. Dobbins, Clerk of Court

                                               MELANIE FOSTER

Date: 5/25/2004                        Melanie A. Foster, Deputy Clerk